IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM MAYO, | ) |
| Plaintiff, | ) Civil Action No. 16-1723 |
| v. | ) Magistrate Judge Lisa Pupo Lenihan |
| RICHARD KELLER, KEVIN BLANCHARD, DAVID EAGLE, MICHAEL BILONICK, TRAVIS CONKLIN, JOHN MCANANY, and ROGER HARVILLA, | ) |
| Defendants. | ) |

## **MEMORANDUM OPINION**

Pending before the court is Defendants' Motion for Summary Judgment. (ECF No. 76.) For the following reasons, the Motion will be granted.

### I. **Procedural Background**

William Mayo ("Plaintiff") is a *pro se* inmate currently incarcerated at the State Correctional Institution Smithfield. He initiated this prisoner civil rights action pursuant to 42 U.S.C. § 1983 with the filing of a Motion to Proceed *in forma pauperis* on November 16, 2016. (ECF No. 1.) After the Motion was granted, his Complaint was filed on November 17, 2016. (ECF No. 3.) Plaintiff filed an Amended Complaint on August 16, 2017 (ECF No. 33) and Defendants filed the pending summary judgment motion, supporting brief and appendix on March 27, 2018 (ECF Nos. 76-78). Plaintiff filed a response in opposition to Defendants' Motion on April 23, 2018. (ECF Nos. 81-84, 86.) Defendants filed a Supplement to their summary judgment motion that same day. (ECF No. 85.) Their Motion is now ripe for review.

1

## II. Factual Background

Plaintiff's Amended Complaint alleges a Fourteenth Amendment due process violation; Eighth Amendment claims for excessive force, denial of medical care, failure to take disciplinary action; and state law claims of negligence and assault and battery. *See*, *generally*, ECF No. 33. His claims stem from an incident that occurred on November 19, 2015, at approximately 8:45 a.m., while he was being processed into the Restricted Housing Unit ("RHU") at the State Correctional Institution Greene following an attack on an officer that occurred around 8:08 a.m. Defendants are Correctional Officers ("CO") Richard Keller, Kevin Blanchard, David Eagle, Michael Bilonick and Travis Conklin; Lieutenant Roger Harvilla; and Registered Nurse Supervisor ("RNS") John McAnany.

Defendants submitted four exhibits that contain excerpts of video footage taken before, during, and after Plaintiff's processing into the RHU on November 19, 2015. (ECF No. 77-2, Exh. 1-4.) The record, including this video footage, reveals the following facts as they relate to the incident in question.

Defendants' first exhibit is video surveillance footage taken from B-Block, A-Pod on November 19, 2015, at approximately 8:08 a.m., and depicts Plaintiff's assault on CO Rodney Walters with a homemade sharpened object. (ECF Nos. 77-2, Exh. 1[1].) After multiple staff responded, Plaintiff was eventually restrained. The video shows that as the officers are taking Plaintiff out of the area, he makes some sort of move and all of the escorting officers react. This results in him being taken to the ground where he claims to have injured his ankle. (ECF Nos.

---

[1] While the assault is captured by the surveillance camera, there is a brief period of time where Plaintiff and CO Walters are amid a struggle and move outside the view of the camera before returning into view. The assault lasts approximately one minute before other officers arrive on scene to help.

77-2, Exh. 1 8:11:17.) Plaintiff claims that once he was out of sight of the video, he was slammed to the ground and shackles were placed on his legs so tight that the circulation in his ankle stopped and he could barely walk. (ECF No. 86, ¶ 3.) This is not evident on the video, but, more importantly, it is NOT the subject of Plaintiff's claims in his Amended Complaint.

Defendants' second exhibit is handheld video footage of officers transporting Plaintiff to medical unit following the assault on CO Walters and his medical assessment by RNS McAnany. (ECF No. 77-2, Exh. 2.) RNS McAnany took pictures of Plaintiff's ankle and offered him ice after Plaintiff complained that his left ankle was injured. (ECF Nos. 77-2, Exh. 2; 77-3, Exh. 5; 77-7, Exh. 9-1 – 9-4.) The medical incident/injury report authored by RNS McAnany indicates that Plaintiff made the following statement with regard to his injury: "I hurt my left ankle when they took me down." (ECF No. 77-3, Exh. 5.) The initial impression was a left ankle sprain and follow-up called for an x-ray to be completed when possible. (ECF No. 77-3, Exh. 5.) The video ends approximately sixteen minutes later with officers transporting Plaintiff by wheelchair to F-Unit for processing into the RHU. (ECF No. 77-2, Exh. 2.)

Defendants' third exhibit begins with handheld video footage from where the second video left off. (ECF No. 77-2, Exh. 3.) The time is approximately 8:31 a.m. and Plaintiff is wheeled to the cage area in the RHU where he is assisted out of the wheelchair and into the strip cage by two officers who place Plaintiff on his knees in order to remove his shackles. (ECF Nos. 77-2, Exh. 3 8:31:50.) Lieutenant Harvilla asks Plaintiff if there is any reason why he cannot participate with the strip search. (ECF No. 77-2, Exh. 3 8:32:22.) Plaintiff complains about his left leg but states that there is no other reason why he cannot participate in the search. (ECF No. 77-2, Exh. 3 8:32:24.) Lieutenant Harvilla then directs the two officers in the strip cage with Plaintiff to take off his shackles and orders Plaintiff to stay where he is and not move. (ECF No.

3

77-2, Exh. 3 8:32:30.) While in the process of unshackling Plaintiff, Officer Blanchard (one of the two officers in the cage with Plaintiff) suddenly shouts something and drops to the ground on top of Plaintiff. (ECF No. 77-2, Exh. 3 8:33:18.) It appears that Plaintiff made some sort of movement, causing Blanchard to react, despite the fact that he was ordered not to move. Plaintiff, however, is barely visible in this video because he is kneeling on the ground in front of Officer Blanchard, whose back is visible, and the top of Plaintiff's head hovers just above the frame. Other officers immediately enter the cage and can be heard shouting "don't move!" and "stop resisting!" before they gain control and restrain Plaintiff on the ground. (ECF No. 77-2, Exh. 3 8:33:19-32.) The entire incident lasts for less than 10 seconds. Lieutenant Harvilla then orders the officers in the cage to reapply Plaintiff's shackles and orders that a blanket be brought and placed in the hallway so that an alternative "prone" strip search can be conducted. (ECF No. 77-2, Exh. 3 8:33:35.) When the shackles are reapplied, Lieutenant Harvilla directs the four officers in the cage to stand Plaintiff up on his knees to face the wall. (ECF No. 77-2, Exh. 3 8:34:12.) Lieutenant Harvilla continues to shout orders at Plaintiff to stay where he is, face forward and not turn his head. ECF No. 77-2, Exh. 3 8:34:54-8:35:05.) Shortly thereafter, Lieutenant Harvilla directs the officers to stand him up, take him out of the cage and lay him on his stomach on the blanket in the hallway. (ECF No. 77-2, Exh. 3 8:35:37.) During this time, Plaintiff is seen exiting the cage in handcuffs with some blood on his head. (ECF No. 77-2, Exh. 3 8:35:46.) He is held against the floor for approximately thirty seconds before another officer returns and places a spit mask on Plaintiff's head. (ECF No. 77-2, Exh. 3 8:36:23.) The officers then remove Plaintiff's prison uniform with scissors while he is still lying face down on the floor on the blanket. (ECF No. 77-2, Exh. 3 8:37-8:39.)

After Plaintiff's uniform is removed and his body is inspected, RNS McAnany arrives and asks Plaintiff if he has any injuries other than his swollen ankle and if he is an asthmatic. (ECF No. 77-2, Exh. 3 8:40:53.) Plaintiff tells him that he is "bleeding from somewhere," and that he hit his head but didn't know where. (ECF No. 77-2, Exh. 3 8:41:24-47.) RNS McAnany examines Plaintiff by having him answer questions such as "do you know where you are right now" and also conducts a neurological test by having Plaintiff follow the movement of his finger with his eyes. (ECF No. 77-2, Exh. 3 8:42:20-33.) The two officers holding Plaintiff then lift him to his feet and put him back in the wheelchair. (ECF No. 77-2, Exh. 3 8:42:46-8:43.) Plaintiff is wheeled to a RHU cell where he is placed inside and his cuffs are removed. Plaintiff can then be seen through the cell window sitting calmly on his bed until the videographer departs a few minutes later. (ECF No. 77-2, Exh. 3 8:43-49.)

At approximately 8:50 a.m., Lieutenant Harvilla conducts a debriefing on camera. (ECF No. 77-2, Exh. 3 8:49:30.) Lieutenant Harvilla announced that the handheld camera operator was Officer Keller and asked Keller whether he had any injuries to report or input on the situation to which he replied "no".[2] (ECF Nos. 77-2, Exh. 3 8:50:18.) Lieutenant Harvilla asked the same of Officers Bilonick, Eagle, Blanchard and RNS McAnany who also stated that they had no injuries to report and no input on the situation, except for Officer Blanchard who reported that he was scraped on the hand and "elbowed in the balls" and RNS McAnany who reported Plaintiff's injuries as a swollen ankle and laceration on his head and stated that someone would be coming by to assess him later. (ECF No. 77-2, Exh. 3 8:50:25-51:20.) The debriefing concluded at approximately 8:52 a.m.

---

[2] Both parties agree that CO Keller never came into contact with Plaintiff. (ECF Nos. 78, ¶ 5; 86, ¶ 5.)

5

The camera footage resumes at approximately 9:24 a.m. with Lieutenant Harvilla and two other officers, who were not involved in Plaintiff's RHU intake processing, going to Plaintiff's cell door to assess his injuries. (ECF No. 77-2, Exh. 3 9:24:02.) A couple of minutes later, RNS McAnany and a female medical staff member can be seen examining Plaintiff through the cell door window. (ECF No. 77-2, Exh. 3 9:26:41.) The female medical staff member gestures to Plaintiff to lower his head and appears to examine his head through the glass window in the cell door. (ECF No. 77-2, Ex. 3 9:26:49.) Both medical personnel then try to talk and listen to Plaintiff through the cell door, which seems difficult because of shouting from nearby prisoners. Finally, RNS McAnany says something to Plaintiff about coming out. While Plaintiff cannot be heard, RNS McAnany is heard stating "it's up to you," before everyone walks away from the cell a few seconds later and the video ends. (ECF No. 77-2, Ex. 3 9:27:12.)

The fourth video exhibit submitted by Defendants is the black and white surveillance footage of the RHU strip cage that was taken by a security camera in the top left corner of the room directly outside the strip cage (if facing the cage). (ECF No. 77-2, Exh. 4[3].) While parts of Plaintiff are still obscured by Officer Blanchard, the video depicts the events in a slightly clearer manner since Plaintiff's right arm is visible and can be seen as the officers work to remove his shackles. The video is a shorter version of what is depicted in the Exhibit 3 video.

Defendants maintain that it is clear from the video evidence alone that the officers did not use an excessive amount of force to maintain control of Plaintiff while in the RHU strip cage because Plaintiff thrusted his elbow into Officer Blanchard's groin area, which caused him to jump back. (ECF No. 78, ¶¶ 7-8.) Plaintiff, however, denies thrusting his elbow into the

---

[3] The time markings on this video is off by about one hour as that on the handheld video footage. While the minutes also do not match up, the video does depict the same events.

officer's groin area stating that it would have been physically impossible for him to do so unless he turned his body, which he claims would have been visible to the camera. (ECF No. 86, ¶ 8.) Instead, Plaintiff claims that the officers "swarmed him" when he was on his knees waiting to have his leg shackles removed, which caused his head "to be slit wide open and ble[e]d profusely." (ECF No. 33, ¶ 14.) Plaintiff also denies resisting based on the fact that he was handcuffed and shackled which would have made it impossible for him to do so. (ECF No. 86, ¶ 9.) Defendants claim that Plaintiff's shackles had been loosened once he was taken to the strip search area (ECF No. 85-1, ¶¶ 4-6.) Plaintiff, however, avers that the shackles were never taken off until after he had been swarmed by officers and was secured in a cell. (ECF No. 86, ¶ 10.)

On November 25, 2015, a misconduct hearing was held regarding the incident in the strip search cage. (ECF No. 33, p.4.) Plaintiff was found guilty after the hearing examiner reviewed video footage and sentenced Plaintiff to 90 days of Disciplinary Custody Status. (ECF No. 33, pp.4-5.) Plaintiff filed an appeal of this decision to the Program Review Committee on December 7, 2015, which denied the appeal on December 11, 2015. (ECF No. 33, p.5.) Plaintiff then submitted a second level appeal to the Superintendent of the Pennsylvania Department of Corrections. (ECF No. 33, p.5.) The Superintendent upheld the hearing examiner's decision. (ECF No. 33, p.5.) Plaintiff appealed to Office of the Chief Hearing Examiner, who also denied the appeal, having found no basis to overturn the hearing examiner's determination of credibility. (ECF No. 33, p. 6.)

**III.** **Standard of Review**

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment may be

granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence, or the lack thereof, which demonstrates the absence of a genuine issue of material fact. Nat'l State Bank v. Fed.l Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992) (citing Celotex, 477 U.S. at 323-25). Once that burden has been met, the nonmoving party may not rest on the allegations in the complaint, but must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e) (1963). *See also* Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995) ("plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case.") (citing Celotex, *supra*).

An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In Anderson, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. …[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Id. at 249-50 (internal citations omitted).

## IV. Discussion

### a. Excessive Force

Plaintiff asserts that Defendants COs Keller, Blanchard, Eagle, Bilonick and Conklin all used excessive force against him in violation of the Eighth Amendment. First, the claim asserted against CO Keller will be dismissed because Plaintiff agrees that he was the handheld camera operator and was never in direct contact with him during the incident giving rise to his claims.

Under the Eighth Amendment's Cruel and Unusual Punishment Clause, inmates are protected against the "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319 (1986). The central question in evaluating an excessive force claim is "whether force was applied in a good-faith effort to maintain and restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992). Although the Eighth Amendment protects inmates against cruel and unusual punishment, it "does not protect an inmate against an objectively de minimis use of force." Smith v. Mensinger, 293 F.3d 641, 648 (3d Cir. 2002).

Where, as here, the pertinent events are captured on video, courts should not rely on the parties' characterizations of the events, but rather should view the facts as they are depicted on the videotape. Scott v. Harris, 550 U.S. 372, 380–81 (2007). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the plaintiff, no reasonable fact finder could view the video of the incident and determine that the defendants acted maliciously and sadistically. Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir. 2009). In making this determination, courts consider the following relevant factors: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts to temper the severity of a forceful response." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 321).

9

Plaintiff claims that the officers beat him without provocation in the RHU strip cage and he described the incident in a grievance that he filed on November 25, 2015. There, he stated that excessive force was applied for approximately fifteen minutes and resulted in a fractured leg and his head bleeding profusely. (ECF No. 77-10.) He also claimed that the reason for the excessive force was in retaliation for his assault on CO Walters earlier that morning. Id. He disagrees with Defendants' description of events, specifically CO Blanchard's claim that the incident was caused by Plaintiff elbowing him in the groin.

Where video evidence contradicts an inmate plaintiff's version of events, the Third Circuit has stated:

> . . . in assessing such claims in a case where an encounter is captured on videotape we are mindful of the fact that when "videotape refutes [an inmate's] assertion that defendant[s] used excessive force," or when the "video shows that [an inmate] did not suffer any physical distress, and a medical report indicates that he had no visible swelling or injuries," we should conclude "viewing the evidence in the light most favorable to [the inmate that], no reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically," and may enter summary judgment on an excessive force claim.

Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir. 2009).

In this case, the video evidence tells a different story than that alleged by Plaintiff. While it is undeniable that certain angles of the videos are not always clear or visible, what is clear is that the circumstances depicted in the videos do not show a sadistic or malicious use of force. Instead, the video evidence shows that the officers involved used an appropriate amount of force for a matter of seconds before it was discontinued as soon as control was maintained.

Moreover, even if Plaintiff is correct in that he did not elbow Officer Blanchard in the groin, the type of force used by Officer Blanchard, and the other officers present, is not the sort of force that is repugnant to the conscience of mankind. *See* Hudson, 503 U.S. at 9-10 (holding the Eighth Amendment does not prohibit "de minimis uses of physical force, provided that the

use of force is not of a sort repugnant to the conscience of mankind" (internal quotation marks and citation omitted)).  It is clear that only the minimal amount of force required to restrain Plaintiff was used and only for a very short time. Furthermore, while Plaintiff complains of a "fractured leg" and bleeding profusely from his head, the video evidence refutes this characterization of his injuries.  Plaintiff's leg was hurt from when he was restrained by officers earlier in the day during the assault on CO Walters.  Indeed, that was the whole reason that Plaintiff had to be transported to the RHU in a wheelchair.  Additionally, while some blood can be seen on Plaintiff's head when he emerges from the strip cage, he was clearly not bleeding "profusely" from the small laceration that is depicted in the pictures.

The Court finds that this is a case where no rational trier of fact could view the videotaped incident and find for Plaintiff.  *See* Scott, 550 U.S. at 372; *see also* Ball v. Beckley, 2014 WL 47732, at *13-14 (M.D. Pa. Jan. 6, 2014) (force was modest in scope, duration and intensity and nothing in the video "could even remotely be characterized as in any way malicious or sadistic, the essential prerequisite to an Eighth Amendment violation.").  Therefore, summary judgment will be granted.

### b.  Failure to Discipline

Plaintiff's claim against Lieutenant Harvilla is that he failed to take disciplinary action "to curb the known pattern of physical abuse . . . by Defendants Keller, Blanchard, Eagle, Bilonick and Conklin." (ECF No. 33, p.7.)  The Court finds that Lieutenant Harvilla is entitled to summary judgment on this claim for the same reasons Defendants are entitled to summary judgment on Plaintiff's excessive force claims.  No reasonable trier of fact could conclude that Lieutenant Harvilla had a duty to discipline Defendants Keller, Blanchard, Eagle, Bilonick and

11

Conklin when there was no underlying excessive force violation committed by these Defendants against Plaintiff.

### c. Denial of Medical Care

Plaintiff alleges that RNS McAnany was deliberately indifferent to his serious medical needs and that the acts of medical care observed in the videos were really just "a play for the camera." (ECF No. 82, p.9.)

The Eighth Amendment imposes a duty on prison officials to provide "humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (internal quotation marks and citations omitted). In the context of medical treatment, an inmate must prove that: (1) he was suffering from a "serious medical need;" and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Estelle v. Gamble, 429 U.S. 97, 106 (1976).

As to the first element, a medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). The second element of deliberate indifference may be shown by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury. Id. at 346-47 (citations omitted). A prisoner must demonstrate that the official acted with more than mere negligence. Estelle, 429 U.S. at 105-106. To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health or safety. Farmer, 511 U.S. at 837.

12

First, Plaintiff has not identified a serious medical injury for which he claims he was denied medical treatment. Nevertheless, when Plaintiff complained of a hurt ankle after his earlier assault on CO Walters, he was brought to the medical unit where he was assessed by RNS McAnany who recommended ice treatment. Additionally, after the incident in the RHU strip cage, RNS McAnany is seen on video examining Plaintiff, acknowledging his head and ankle injuries, asking questions about his head injury, conducting what appears to be a neurological exam, and documenting Plaintiff's injuries by taking photos. RNS McAnany also reported Plaintiff's injuries to Lieutenant Harvilla during the debriefing and returned to Plaintiff's cell not long thereafter to check on him. RNS McAnany and a female medical staff member attempt to assess Plaintiff through his cell door but Plaintiff refused to be assessed.

No reasonable jury would find RNS McAnany deliberately indifferent to Plaintiff's medical needs, which are debatably serious at most, after watching the video evidence. RNS McAnany was present at each stage of Plaintiff's processing into the RHU, examined him closely and made necessary documentations. Plaintiff has failed to offer any evidence other than conclusory statements that RNS McAnany had a subjective intent to ignore his medical needs and was simply playacting for the camera. As such, summary judgment will be granted.

### d. Assault and Battery

Plaintiff claims that Defendants' actions amounted to the state tort of assault and battery under Pennsylvania law. Defendants correctly assert that they are entitled to sovereign immunity.

Under Pennsylvania law, "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive

13

the immunity." 1 PA. CONS. STAT. § 2310. Sovereign immunity applies to intentional as well as negligent torts. Story v. Mechling, 412 F. Supp. 2d 509, 518-19 (W.D. Pa. 2006). There are, however, nine exceptions to sovereign immunity: (1) vehicle liability; (2) medical/professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoid and vaccines. 42 PA. CONS. STAT. § 8522(b).

Although Plaintiff's state law claims against Defendants are not included in the categories for which sovereign immunity has been waived, Defendants are only entitled to immunity if they acted within the scope of their employment during the events that occurred on November 19, 2015. *See* 1 PA. CONS. STAT. § 2310. Under Pennsylvania law, conduct falls within the scope of employment if it "is of a kind and nature that the employee is employed to perform; it occurs substantially within the authorized time and space limits; it is actuated, at least in part, by a purpose to serve the employer; and if force is intentionally used by the employee against another, it is not unexpected by the employer." Strothers v. Nassan, Civ. No. 08-1624, 2009 WL 976604, at *8 (W.D. Pa. Apr. 9, 2009) (quoting Natt v. Labar, 543 A.2d 223, 225 (Pa. Commw. Ct. 1988)).

The record evidence clearly demonstrates that Defendants were acting within the scope of their employment during the incidents at issue in this case. Unquestionably, the Defendants were on duty, in uniform and performing their job functions and therefore cannot be liable for the Pennsylvania state tort claim of assault and battery. As such, summary judgment will be granted in their favor.

    e. **Negligence**

Plaintiff asserts a negligence claim against RNS McAnany based on his alleged failure to provide him with appropriate medical care. However, this claim is subject to dismissal because of Plaintiff's failure to file a Certificate of Merit ("COM").

Pennsylvania law requires that a COM accompany a claim for professional liability brought against certain designated licensed professionals. This requirement is provided for in Pennsylvania Rule of Civil Procedure 1042.3, which states that the COM must be filed within sixty days following any action where it is alleged that "a licensed professional deviated from the acceptable professional standard." Pa. R. Civ. P. 1042.3. The COM must contain a written statement from "an appropriate licensed professional" declaring whether the professional liability claim is brought directly (the defendant's conduct fell below the standard of care, bringing about the harm), indirectly (the conduct of persons under the direction of the defendant fell below the standard of care, bringing about the harm), or that no expert testimony will be necessary to prosecute the claim against that defendant. Pa. R. Civ. P. 1042.3 (a)(1)-(3).

The Third Circuit has held that this COM requirement is a rule of substantive law and must be applied by federal courts in professional negligence cases. Liggon-Redding v. Estate of Sugarman, 659 F.3d 258, 264-65 (3d Cir. 2011). As Plaintiff has failed to file a COM to date, any and all claims of professional negligence against RNS McAnany shall be dismissed.

### f. Due Process

Defendants argue that Plaintiff fails to state a claim for violation of his due process rights because he fails to assert this claim against any named Defendant. They also argue that Plaintiff's denial of due process claim fails anyway because he did not suffer a loss of liberty interest that would entitle him to due process protections. Plaintiff responds that he never received an initial copy of the misconduct report he was given following the events on

November 19, 2015, and was thus denied the proper notice due to him under the Fourteenth Amendment.

In analyzing any procedural due process claim of this type, "the first step is to determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000) (citing Fuentes v. Shevin, 407 U.S. 67 (1972)). Once the court determines that a protected property or liberty interest has been asserted, the question then becomes what process is due to protect it. Id. (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). Protected liberty or property interests generally arise either from the Due Process Clause or from some state-created statutory entitlement. *See* Bd. of Regents v. Roth, 408 U.S. 564, 575 (1972).

In Sandin v. Conner, 515 U.S. 472 (1995), the Supreme Court pronounced a new standard for determining whether prison conditions deprive a prisoner of a liberty interest that is protected by due process guarantees. Specifically, the Supreme Court held that prison conditions do not impact a protectable liberty interest unless they result in an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 483. Applying this test, the Supreme Court concluded that the prisoner in Sandin did not have a protected liberty interest in remaining free of disciplinary detention or segregation because his thirty-day disciplinary detention, though punitive, did not present a dramatic departure from the basic conditions of his sentence. *See also* Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002) (explaining that administrative or punitive segregation alone will rarely be enough to establish an atypical deprivation sufficient to implicate a liberty interest). The Third Circuit held in Smith v. Mensinger that seven months of disciplinary confinement did not violate a protected liberty interest of an inmate. 293 F.3d 641, 654 (3d Cir. 2002). *See also* Griffin v. Vaughn, 112 F.3d

16

703, 706 (3d Cir. 1997) (holding that an inmate's confinement in administrative custody for a period of fifteen months was not an atypical and significant hardship implicating a liberty interest).

As a result of the misconduct charges filed against Plaintiff, he was sentenced to 90 days of Disciplinary Custody Status. This amount of time is clearly insufficient to establish an atypical and significant hardship that would implicate a liberty interest and entitle Plaintiff to due process protections. Thus, summary judgment will be granted.

V. **CONCLUSION**

For the foregoing reasons, the Motion for Summary Judgment filed by Defendants (ECF No. 76) will be granted.

Dated: September 19, 2018.

Lisa Pupo Lenihan
United States Magistrate Judge

cc: William Mayo
FZ-2947
SCI Smithfield
P.O. Box 999
1120 Pike Street
Huntingdon, PA 16652

Counsel for Defendants
*Via CM/ECF Electronic Mail*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM MAYO, | Civil Action No. 16-1723 |
| Plaintiff, | |
| v. | Magistrate Judge Lisa Pupo Lenihan |
| RICHARD KELLER, KEVIN BLANCHARD, DAVID EAGLE, MICHAEL BILONICK, TRAVIS CONKLIN, JOHN MCANANY, and ROGER HARVILLA, | |
| Defendants. | |

## ORDER

**AND NOW**, this 19th day of September, 2018;

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment (ECF No. 76) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Plaintiff has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

Lisa Pupo Lenihan
United States Magistrate Judge

cc: William Mayo
FZ-2947
SCI Smithfield
P.O. Box 999
1120 Pike Street
Huntingdon, PA 16652

Counsel for Defendants
*Via CM/ECF Electronic Mail*